J.S. HOLT, Secretary, Board of Regents, University of WisconsinSystem
Your letter of July 22, 1974, requests advice concerning the use of University space by religious organizations. Information provided along with your request and learned in subsequent conversations with University staff members indicates that the Council on Ministries of the Wisconsin Conference of the United Methodist Church has inquired whether the campuses of the University of Wisconsin-Stevens Point and the University of Wisconsin-River Falls might be available on June 5, 6, 7, and 8, 1975, for their annual conference.
In addition, you have received an inquiry from Congregation Emanu-EI B'ne Jeshurun of 2419 East Kenwood Boulevard, Milwaukee, a Jewish synagogue, as to whether the University campus at Milwaukee might rent space to that religious organization while a renovation of a portion of its existing facility takes place from mid-October to the end of the 1974-75 school year.
You ask whether there are any constitutional or statutory prohibitions against allowing such uses of University property. I will deal with the constitutional questions first.
FIRST AMENDMENT
The First Amendment to the Constitution of the United States provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ." The federal constitutional provision applies to Congress and federal agencies and to the states through theFourteenth Amendment. *Page 375 
Some discussion on what the United States Supreme Court has said in regard to what can and cannot be done under the Establishment Clause of the First Amendment appears in order.
In Cantwell v. Connecticut (1940), 310 U.S. 296, 60 S.Ct. 900,84 L.Ed. 1213, the United States Supreme Court made both the Establishment Clause and the Free Exercise Clause of theFirst Amendment applicable to the states through theFourteenth Amendment.
In Zorach v. Clauson (1952), 343 U.S. 306, 72 S.Ct. 679,96 L.Ed. 954, a New York City program for releasing students during the school day so that they could leave the school buildings and school grounds and go to religious centers for religious instruction or devotional exercises was found not to violate theFirst Amendment. The court distinguished the case of McCollum v.Board of Education (1948), 333 U.S. 203, 68 S.Ct. 461,92 L.Ed. 249, where the classrooms were turned over to religious instructors during a portion of the school day. The court rejected a suggestion that the releasing of children to attend religious classrooms was a system of coercion to get the public school students to attend the religious classes.
Although supporting the doctrine that the First Amendment reflects the philosophy of our Founding Fathers that the church and state should be separated, the court made this significant statement:
 ". . . The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other — hostile, suspicious, and even unfriendly. . . ." 343 U.S. 312.
This language seems to approve some forms of state and religious cooperation and more recent cases seem to turn on the amount of "entanglement" between government and the church.
In the case of Committee for Public Education and ReligiousLiberty v. Nyquist (1973), 413 U.S. 756, 93 S.Ct. 2955,37 L.Ed.2d 948, the court held that a New York statute providing for payment out of public funds for maintenance and repair for private schools, tuition reimbursement for private school pupils, and income tax *Page 376 
benefits to parents of children attending New York's nonpublic schools all violate the Establishment Clause of theFirst Amendment. On the same date the court decided Sloan v. Lemon
(1973), 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939, which held that a Pennsylvania statute providing for reimbursement of tuition paid by parents who send their children to nonpublic schools had the impermissible effect of advancing religion and was unconstitutional under the Establishment Clause. However, also on the same date, the court decided Hunt v. McNair (1973),413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923. This was an action challenging the South Carolina statutory scheme for aiding colleges by issuance of revenue bonds for projects excluding facilities for sectarian study or religious worship but involving a benefit to a Baptist-controlled college. The court held that the purpose of the act is secular, the benefits being available to all institutions of higher education whether or not they have the religious affiliation and that therefore the statute does not have the primary effect of advancing or inhibiting religion. The court concluded that the statute does not foster an excessiveentanglement with religion.
It appears that the United States Supreme Court has adopted a three-pronged rule which governs their consideration of statutes challenged as being in violation of the Establishment Clause: first, whether the statute has a secular legislative purpose; second, whether its principal or primary effect is one that neither advances nor inhibits religion; and three, whether it fosters an excessive entanglement with religion. The above decisions and others make it clear that the First Amendment does not bar all state aid to religion of whatever kind or extent. This is obvious when we consider that states do and may furnish churches and parochial schools with police and fire protection, water and sewerage facilities, tax exemptions for places of worship, bus transportation for parochial students as well as those going to public schools, books, and as the court held inHunt v. McNair, supra, the state may become the owner of property of a church-sponsored college and lease it back to the college, all with the purpose and effect of permitting revenue bonds issued in connection with the college's operation to be tax-exempt with a lower rate of interest. As Justice White points out in his dissent in Nyquist, the court cases evidence the difficulty in perceiving when the state's involvement with religion passes the peril point. *Page 377 
Although the United States Supreme Court has not yet considered the question of whether leasing of facilities in a public institution to a religious organization violates theFirst Amendment, it is apparent that such question would be judged by the three elements mentioned above.
WISCONSIN CONSTITUTION
Article I, sec. 18, of the Wisconsin Constitution prohibits giving any preference by law to any religious establishments or modes of worship and also prohibits the drawing of any money from the state treasury for the benefit of religious societies or religious or theological seminaries.
Although the Wisconsin Supreme Court has not considered whether the use of public school or college buildings by religious groups constitutes a violation of the provisions of Art. I, sec. 18, it has spoken on the use of a sectarian building for public school purposes. In Dorner v. School District (1908), 137 Wis. 147,118 N.W. 353, the court approved the maintenance of a public school in a parochial school building, and in State ex rel. Conway v.District Board (1916), 162 Wis. 482, 156 N.W. 477, the court found that holding public school graduation exercises in a church where invocations were offered by Catholic and Protestant clergymen did not violate Art. I, sec. 18, of the Wisconsin Constitution.
Article I, sec. 24, of the Wisconsin Constitution as created in April, 1972, reads as follows:
 "Nothing in this constitution shall prohibit the legislature from authorizing, by law, the use of public school buildings by civic, religious or charitable organizations during nonschool hours upon payment by the organization to the school district of reasonable compensation for such use."
In accordance with the authority of sec. 24, the legislature amended sec. 120.13 (19) by ch. 290 of the Laws of 1973. This section reads as follows:
 "120.13 School board powers. The school board of a common or union high school district may:
"*** *Page 378 
 "(19) USE OF PROPERTY FOR FEES. Grant the use of school buildings and grounds to any responsible organization for public meetings to which an admission price is demanded, and to charge for such use an amount fixed by the school board and grant the use of school property during nonschool hours to religious organizations upon payment of reasonable fees and upon such conditions as the board determines, if such use does not interfere with the prime use of the school property. Amounts so received shall be paid into the school district treasury to constitute part of the general fund and to be used for the benefit of the schools of the school district."
Thus, both by Wisconsin constitutional provisions and statute,public school buildings may be used by religious organizations upon payment of reasonable fees and upon such other conditions as the Board determines. Public school buildings are usually construed to be grade and high school buildings, so these provisions would not apply to state-owned college or university buildings. See Words and Phrases, Public Schools.
Article X, sec. 6, of the Wisconsin Constitution provides in part:
 ". . . no sectarian instruction shall be allowed in such university."
This provision prohibits the University from offering courses which either have the effect of advancing or opposing religion. See 55 OAG 262, 263 (1966), and 1966 Wis. L. Rev. 297.
The Wisconsin Supreme Court adopted the "primary effect" rule in State ex rel. Warren v. Reuter (1969), 44 Wis.2d 201, 227,170 N.W.2d 790. Our court directly applied that test in State exrel. Warren v. Nusbaum (1972), 55 Wis.2d 316, 198 N.W.2d 650, as well as the "excessive entanglement" rule. See also 58 OAG 163 (1969).
See also State ex rel. Warren, et al. v. Nusbaum (1974),64 Wis.2d 314, 219 N.W.2d 577, where the "three-pronged" test was used to approve ch. 89 of the Laws of 1973 which deals with aids to children with exceptional educational needs.
STATUTORY AUTHORITY *Page 379 
In the question before us we are not dealing directly with a statute but with contracts which might be entered into under authority of general statutes which give the Board of Regents ". . . all powers necessary or convenient for the operation of the system except as limited in this chapter." (Sec. 36.09 (1) (k), as created by ch. 335, Laws of 1973.) There being no limitation on the Regents' authority to rent or lease portions of University premises in ch. 335 except for "purposes, objects and uses of the system authorized by law" (sec. 36.11 (1) (b)), I must conclude that the general authority to temporarily lease space to outside organizations, whether religious in nature or otherwise, has been given to the Regents by the legislature. I must also conclude that the statute involved has a secular legislative purpose and that the primary effect of the statute is not to advance religion.
EXCESSIVE ENTANGLEMENTS
The last question is more difficult to answer. Would the proposed use of state-owned facilities at University campuses by Methodist and Jewish organizations result in "excessive entanglements" within the meaning of that term as used in Stateex rel. Warren, et al. v. Nusbaum, supra, State ex rel. Warren v.Nusbaum, supra, Lemon v. Kurtzman (1971), 403 U.S. 602,91 S.Ct. 2105, 29 L.Ed.2d 745, and Tilton v. Richardson (1971),403 U.S. 672, 91 S.Ct. 2091,29 L.Ed.2d 790?
Justice Robert W. Hansen, writing for the court in Nusbaum
(1972), said at 55 Wis.2d, page 330:
 ". . . What we are dealing with is `. . . the risk that government aid will in fact serve to support religious activities. . . .' Tilton listed facts and factors that reduced such risk in that case. The Tilton
opinion concluded that, cumulatively, weighed together they shaped a `narrow and limited relationship with government' and, as a result, there was `less potential for realizing the substantive evils against which the Religion Clauses were intended to protect.'"
And, at page 334:
 ". . . However, Tilton lessens the reach of earlier decisions of this court[33] insofar as the first amendment is concerned . . ." *Page 380 
The footnote cites State ex rel. Weiss v. District Board
(1890), 76 Wis. 177, 44 N.W. 967, State ex rel. Reynolds v.Nusbaum (1962), 17 Wis.2d 148, 115 N.W.2d 761, and State ex rel.Warren v. Reuter, supra, all cases which have adhered to tight standards in the separation of church and state.
In seeking guidance from the state and federal supreme court decisions we must remember that the cases are not directly in point which have dealt with the entanglement question.
In order to determine whether government entanglement with religion is excessive the court in Lemon v. Kurtzman pointed to three criteria that should be examined, as follows:
(1) The character and purposes of the institutions that are benefited.
(2) The nature of the aid that the state provides.
(3) The resulting relationship between the government and the religious authority.
In that case, and a companion case, the court held there was excessive entanglement of state with church where (1) salary supplements were paid to teachers of secular subjects in nonpublic schools, and (2) where there is reimbursement of nonpublic schools for teacher salaries, textbooks and instructional materials for teaching secular subjects.
By contrast, the Higher Education Facilities Act was approved, except as to a 20-year government interest, in Tilton v.Richardson. Federal construction grants to colleges and universities which are church-related are authorized if the buildings are to be used for secular educational functions. No grant can be made for a facility to be used for ". . . sectarian instruction or as a place for religious worship . . ."
Some cases involving this type of entanglement have been decided in other states. However, most of the reported cases from other states involve the question of a public school building or grounds to be used during nonschool time for holding religious meetings or for other religious purposes, and do not involve college or university buildings. The constitutional provisions usually invoked by those objecting to the use of public school premises for religious meetings or other *Page 381 
religious purposes during nonschool time are those which require separation of church and state or prohibit taxation or use of government funds for the support of any religion or religious institution or house of worship. There are a number of cases in which the particular use of a public schoolhouse or premises for religious purposes during nonschool time permitted or authorized by the school authorities have been held not to violate the particular clause or clauses of the state constitution invoked by the objecting party. In most of these instances the use for religious meetings or the like was permitted only infrequently or on a temporary basis.
In the case of Southside Estates Baptist Church v. Board ofTrustees (Fla. 1959), 115 S. 2d 697, 79 A.L.R. 2d 1142, a Florida statute provided that the trustees of a school district could provide for or permit the use of school buildings and grounds in nonschool hours during the school term or during vacation for "any legal assembly." Under that authority the trustees of a school district permitted a number of different churches to use various school buildings on Sundays for holding church services, each of the authorizations for use being for temporary use of the buildings pending completion of construction of church buildings. The court denied an injunction sought by taxpayers of the district to prohibit such temporary use of the public school buildings for religious meetings and the appellate court upheld that denial. The court said that the statute and the permission granted thereunder did not, under the circumstances shown, violate any of the complaining taxpayers' rights under the Florida Constitution which provided that "No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution."
The court found nothing in the record to support a conclusion that any public funds had been contributed to any of the churches and it considered that the slight wear and tear upon the school building involved in such religious meetings, if such was an indirect contribution from the public treasury, was immaterial under the maxim "de minimis non curat lex" and that it did not appear that any preference had been given to one sect or denomination over any other in this activity since its inauguration of the policy permitting such temporary usage. *Page 382 
The court went on to find that such temporary use of the school buildings for holding church services on Sunday was not a violation of the First Amendment to the Federal Constitution providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," the court reasoning that it found nothing in the conduct of the trustees to suggest the involvement of public funds or property in the establishment of religion or in preferring one religious faith over another.
The opinion emphasizes that the various religious denominations were permitted to make use of the school buildings on Sundays only, temporarily during the pendency of the construction of the individual organization's church building, and implies that if the use of the school buildings was permitted for prolonged periods of time without evidence of an immediate intention on the part of the church to construct its own building, the answer might be different.
Other cases finding no constitutional objection to the use of school properties by religious organizations include:
 Nichols v. School Directors (1879), 93 Ill. 61, 34 Am. Rep. 160;
 Davis v. Boget (1878), 50 Iowa 11;
 State ex rel. Gilbert v. Dilley (1914), 95 Neb. 527, 145 N.W. 999;
 Baer v. Kolmorgen (1958), 14 Misc. 2d 1015, 181 N.Y.S. 2d 230.
There are relatively few cases holding a constitutional provision violated by the particular religious use of public school premises permitted at times when the school was not in session. However, a few Pennsylvania cases, although somewhat indefinite as to the specific constitutional provision infringed, seem to agree that the fundamental law of the state was violated by permitting a public schoolroom to be used for religious meetings or other religious purposes during nonschool time. SeeBender v. Streabich (1897), 182 Pa. 251, 37 A. 853, and Hysong v.Gallitzin Borough School Dist. (1894), 164 Pa. 629, 30 A. 482.
CONCLUSION *Page 383 
The first situation on which you seek advice is the case of the Jewish Congregation directly across the street from the campus in Milwaukee which has scheduled a renovation of a portion of its existing facility which will displace the religious school program from mid-October through the 1974-75 school year. Classes are held primarily on Saturday and Sunday mornings, with additional classes being held in the late afternoon on Monday and Wednesday; 500 students are affected. The Congregation desires to rent space from the University during the period when this renovation program is taking place. It just happens that the University and the synagogue are adjacent to one another, but there is no question but that the character and purposes of the institution are religious in nature. The nature of the proposed contract (aid) would be to make available to the Congregation, on a temporary basis during nonschool hours and apparently primarily on nonschool days, space that presumably would not be used for any other purpose at that time. The relationship of the parties would be merely that of landlord and tenant for the temporary period.
It would appear that such arrangements would not result in "an excessive entanglement" between the State of Wisconsin and the Congregation involved. There is no question but what such an arrangement would result in some entanglement between church and state. The rule, however, is that such entanglement must not beexcessive. If the arrangement is for a limited specified period of time at a reasonable rental without the state being involved in any way in the instructional program, it would appear that the occasional use of state-owned properties in this manner would be consistent with the philosophy that the Establishment Clause of the First Amendment does not require the government to adopt an attitude of active antipathy towards religion.
My advice, of course, is based upon what I conclude to be the likely result if a lawsuit was started to test this type of arrangement. An ultimate answer would have to be obtained from the appropriate appellate court where the law could be applied to a specific case.
Having made conclusions in regard to the use of University property for a temporary religious school program, the second question, in regard to the use of University facilities by the United Methodist Church for their 1975 annual conference, seems to present *Page 384 
even less evidence of excessive entanglement between church and state.
Here, assuming that space is available, about 1,000 members of the Methodist Church would convene in the summer of 1975. The Conference would be expected to pay full costs for the use of the facilities and the conference itself is primarily a meeting at which the business of the Wisconsin Conference of the Council on Ministries is transacted. I am of the opinion, therefore, that whether the Regents wish to accommodate a conference of this nature is more a matter of policy than constitutional determination. However, it should be kept in mind that the manner in which facilities are rented to religious organizations could create a constitutional question. For instance, if one religious group is granted certain privileges and another group is denied those same privileges, an allegation could be made that one religion is being favored by the state over another. Therefore, if the University embarks on a policy of allowing religious organizations to use the University facilities, it will be necessary to treat all religious groups alike in order to avoid a charge of favoritism.
It is well recognized, of course, that public officials have, in the absence of statutory provisions for such use, the authority to prohibit the use of a public school or college building for religious purposes. Hunt v. Board of Education ofCounty of Kanawha (S.D. W.Va. 1971), 321 F. Supp. 1263; State exrel. Greisiger v. Grand Rapids Board of Education (1949),88 Ohio App. 364, 100 N.E.2d 294, app. dsmd. 153 Ohio St. 474,92 N.E.2d 393, cert. den. 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 603, reh. den. 341 U.S. 917, 71 S.Ct. 733, 95 L.Ed. 1352.
Finally, I would advise that if University property is leased to a religious group the charges to be made for use of the property be sufficient to insure that the state will not be required to expend any public funds to accommodate those renting the premises during the period authorized. The Board should also make sure that the renting of the facilities to religious organizations does not interfere with the use of those facilities for school purposes.
RWW:LLD *Page 385