520 P.2d 514

**Martin S. PRATT, Petitioner,**

v.

**ARIZONA BOARD OF REGENTS, Respondent.**

**No. 11481.**

Supreme Court of Arizona, In Banc.

March 27, 1974.

Martin S. Pratt, in pro per.

Gary K. Nelson, Atty. Gen., by Ralph E. Willey, Asst. Atty. Gen., Phoenix, for respondent.

CAMERON, Vice Chief Justice.

This is a petition for special action brought in this court by Martin S. Pratt alleged to be a "resident, citizen, voter and taxpayer in Maricopa County, Arizona."

Petitioner asks us to prohibit, as being unconstitutional, the actions of the Arizona Board of Regents in agreeing to lease to Evangelist Billy Graham the football stadium located on the campus of Arizona State University in Tempe, Arizona, otherwise known as Sun Devil Stadium, for a series of religious services. The standing of the petitioner to bring this action is not questioned by the State, but see Baer v. Kolmorgen, 14 Misc.2d 1015, 181 N.Y.S.2d 230 (1958) and Lewis v. Mandeville, 201 Misc. 120, 107 N.Y.S.2d 865 (1951). We accepted jurisdiction of petitioner's request because of the importance of the constitutional question involved.

The facts necessary for a determination of this special action are as follows. On 29 January 1974, the Arizona Board of Regents agreed to lease Sun Devil Stadium to Reverend Graham from 5 May 1974 through 12 May 1974, for a total lease payment of $39,995.00. It is understood that Reverend Graham will conduct religious "worship, exercise or instruction" in Sun Devil Stadium. It is not questioned that the total amount of the lease, $39,995.00, is a fair rental value for the lease of said stadium, and neither is there any question that the use of this stadium at this particular time does not interfere with the instruction, teaching, and training conducted at Arizona State University. Nor do we have a question concerning the power of the Board of Regents to lease, for the statute provides:

"B. The board may:

\*    \*    \*    \*    \*    \*

"4. Purchase, receive, hold, make and take leases of, and sell real and personal property, for the benefit of the state and for the use of the institutions under its jurisdiction." § 15–724 (B) A.R.S.

We are then concerned with only one question and that is: Does the provision of the Arizona State Constitution, Art. 2, § 12, A.R.S. prohibit the Board of Regents from entering into this lease?

Historically, the separation of church and state, mandated by the First Amendment to the United States Constitution, was a break with the past rather than an attempt to adopt the practices of the colonists, many of whom brought with them to these shores something far different from a belief that the state should be neutral in matters of religion.

For example, the predecessor to the First Amendment to the United States Constitution was the "Memorial and Remonstrance Against Religious Assessments" presented to the General Assembly

468

of the Commonwealth of Virginia as a result of proposed legislation which provided for a tax on all real property to support teachers of the Christian religion. Chief Justice Vanderbilt in the case of Tudor v. Board of Education of Borough of Rutherford, 14 N.J. 31, 100 A.2d 857 (1953), pointed out that New Jersey excluded Catholics from the right to hold office until the Constitution of 1844. Tudor, supra, 100 A.2d at 862. By the time of the Arizona Constitutional Convention, however, separation of church and state had become an accepted principle as reflected by the constitutions of most of the states of the United States.

Article 2, § 12 of Arizona's Constitution reads as follows:

"Section 12. * * * No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment. * *"

We have previously stated regarding this section:

" * * * The prohibitions against the use of public assets for religious purposes were included in the Arizona Constitution to provide for the historical doctrine of separation of church and state the thrust of which was to insure that there would be no state supported religious institutions thus precluding governmental preference and favoritism of one or more churches. * * *

*     *     *     *     *     *

" * * * [T]he constitutional prohibitions against furnishing aid or support to any religious worship, exercise or instruction, and against using public funds to aid any church or private or sectarian school or public service corporation must be rigidly enforced in context of the contemporary fabric of our society and in light of its needs. * * * " Community Council v. Jordan, 102 Ariz. 448, 451, 456, 432 P.2d 460, 463, 468 (1967).

▮ We believe that the framers of the Arizona Constitution intended by this section to prohibit the use of the power and the prestige of the State or any of its agencies for the support or favor of one religion over another, or of religion over nonreligion. The State is mandated by this constitutional provision to be absolutely impartial when it comes to the question of religious preference, and public money or property may not be used to promote or favor any particular religious sect or denomination or religion generally. It does not necessarily follow, however, that the framers of Arizona's Constitution intended to entirely prohibit the use by religious groups of public and school property for religious purposes, when it is clear that such use does not infer support or favor by the State of that particular religious group.

At the time of Arizona's Constitutional Convention, the one-room schoolhouse was common, and automobile transportation had not overcome the isolation of many of our communities. It was then common practice for the residents of a particular school district to use the schoolhouse as the meeting place for many community purposes during non-school time, and it was not unknown then or today for church services or other religious meetings to be held in schools so long as they did not interfere with school purposes. It is probably because of this commonly accepted practice that there are no cases in the Arizona Reports which consider this question directly, it being assumed that so long as the use of the school premises did not interfere with educational activities and as long as there was no damage to facilities, this was a permissible use of school property and one not contrary to the separation clause of our Constitution.

Whether we wish to follow a strictly historical view in interpreting our State Constitution and this particular section, or whether we wish to interpret it "in context of the contemporary fabric of our society and in light of its needs," as Justice Lorna Lockwood stated in Community Council v. Jordan, supra, we reach the same result.

■ We do not believe leasing Sun Devil Stadium for an occasional religious service at a fair rental value is an appropriation or application of public property for religious purposes. It is a straight commercial transaction in which it is known and understood by the parties and the public that The Reverend Graham will be allowed, for a price, the use of Sun Devil Stadium to advance his own cause and the lease does not place the power, prestige, or approval of the State or Arizona State University behind the religious beliefs of the lessee, nor connote favor by the State for Reverend Graham over any other religious group with the money to lease the stadium. As the response of the State in this action stated:

"Respondent Board of Regents has not entangled the State of Arizona in any church related activity, and has helped maintain the state neutrality by handling the rental of Sun Devil Stadium to Rev. Graham in a businesslike manner. The State is merely leasing a forum for Rev. Graham's worship services—a forum available to all others where a legitimate need for such a forum is shown, and there is no interference with the operation of university programs. The Board of Regents has not sought to favor or handicap Evangelist Graham. Rev. Graham will flourish or flounder, not because the State has rented Sun Devil Stadium to him, but rather because of the appeal, or lack thereof, of his dogma. The state neutrality in this matter extends to all religions or worship, as it involved a mere business transaction and nothing more."

Assuming the Board of Regents, in its discretion, will not enter into a lease which would interfere with the operation and orderly administration of the University program and will be consistent with the equal protection clause of the Fourteenth Amendment to the United States Constitution, the twin keys to the use of this stadium for the purpose stated are fair rental value and the occasional nature of the use. The lease to a religious group, on a permanent basis, of property on the University campus, for example, would be an entirely different matter because by the permanency of the arrangement, the prestige of the State would be placed behind a particular religion or religion generally. Also, the lease of campus facilities for occasional use, but not for fair rental value, would violate the provision of our Constitution as being an appropriation or application of State property for religious purposes.

The Florida Supreme Court, in construing its admittedly different establishment clause, has made the same distinction:

"* * * Lest it be concluded that the discretion conveyed to the trustees is unlimited, we interpolate by way of dictum that it is conceivable that the power granted by this statute could be so abused that it would result in a violation of the Constitution. For example, if the use of the school buildings were permitted for prolonged periods of time, absent evidence of an immediate intention on the part of the Church to construct its own building, we think it could hardly be contemplated that the public school system or its property could be employed in the permanent promotion of any particular sect or denomination. * * *" Southside Estates Baptist Church v. Board of Trustees, School Tax Dist. No. 1, In and For Duval County (Fla.), 115 So.2d 697, 700 (1959), 79 A.L.R.2d 1142, 1146–1147.

Considering the historical setting in which this article was proposed and approved by the voters of our new State as well as the contemporary fabric or our society today, we believe that the lease in question does not place the power, prestige, or influence of the State behind Reverend Graham's religious beliefs and practices, nor, it being for a fair rental price, is it an appropriation or application of State property for religious purposes.

The relief requested by petitioner, Martin S. Pratt, is, by this opinion, denied.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.